UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JONATHAN CARROLL, on behalf of himself
and all others similarly situated,

                                                    Case No. 1:16-cv-04561

      Plaintiff,

v.

CRÈME DE LA CRÈME, INC.,

      Defendant.
_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS**

## INTRODUCTION

The Illinois Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1 to 14/99 (West, Westlaw through P.A. 99-324 of 2015 Reg. Sess.), requires private entities to, *inter alia*, (1) provide statutorily-compliant written disclosures and obtain a statutorily-compliant written release prior to gathering, storing or disseminating an individual's fingerprints, among other unique biometric identifiers and information; (2) refrain from selling, leasing, trading, or otherwise profiting from an individual's fingerprints; and (3) exercise a statutorily-compliant standard of care for protecting an individual's stored fingerprints from disclosure. Crème has gathered, indefinitely stored and disseminated fingerprints from thousands of individuals in Illinois, including Plaintiff, without complying with <u>any</u> of these requirements.

Crème <u>does not deny</u> that it violates each provision of BIPA. Instead it argues, based on a misreading of *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), that Plaintiff has failed to allege a cognizable injury in fact sufficient to satisfy the standing requirements of Article III. This argument fails for several reasons. *Spokeo* merely reaffirmed well-established Article III standing principles -- that "intangible injuries can nevertheless be concrete," and that "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Spokeo*, 136 S. Ct. at 1549. Applying those principles here makes clear that Plaintiff has Article III standing. By collecting and storing Plaintiff's (and numerous other class members') sensitive, biologically unique fingerprints without first providing proper written disclosures or receiving written authorization as required by BIPA, Crème misappropriated Plaintiff's personal property, caused him informational injury and invaded his privacy -- the very harms that motivated the Illinois legislature's enactment of BIPA and that have long been recognized at common law. It is irrelevant whether Plaintiff understood how Crème would use his fingerprints; because he was the object of a violation of BIPA's disclosure requirements, Plaintiff "suffered injury in precisely the form the statute was intended to guard against, and therefore has standing." *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Even

if the misappropriation of property, invasion of privacy and informational injury suffered by Plaintiff were insufficient under Article III, the risk of future harm resulting from Crème's illegal collection and indefinite storage of fingerprints is itself another concrete injury sufficient to confer Article III standing. Crème's fingerprint database could fall into the wrong hands and possibly lead to identity theft or an imposter picking up a child from Crème's facility. Such a grave risk of harm is clearly concrete based on the Supreme Court's reasoning in *Spokeo*.

Finally, Plaintiff has standing under the Illinois constitution and statutory standing under BIPA based on the very same tangible and intangible harms giving rise to Article III standing.

## STATUTORY BACKGROUND

BIPA prohibits private entities from possessing, capturing, collecting, purchasing, receiving through trade, or otherwise obtaining an individual's biometric identifiers (including fingerprints) or biometric information, *see* 740 Ill. Comp. Stat. 14/10, absent an express written release from the individual following a written disclosure informing the individual of the collection and storage (and the specific purpose and duration of such collection and storage) of his or her biometric identifiers or biometric information. *Id.* 14/15(a), (b), (d). BIPA further provides that "[n]o private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 Ill. Comp. Stat. 14/15(c).[1]

The Illinois legislature's motivation for regulating fingerprints and other biometrics was based on its understanding that biometrics embody a person's immutable biological characteristics, and thus, unlike other identifiers, cannot be changed in the event of a security breach:

---

[1] The statute also requires private entities to "store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry," and to protect them from disclosure in a manner that is the same as or more protective than the manner in which the private entity stores, transmits, and protects other confidential and sensitive information." *Id.* 14/15(e).

> Major national corporations have selected the City of Chicago and other locations in this State as pilot testing sites for new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias.
>
> Biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions.
>
> An overwhelming majority of members of the public are weary of the use of biometrics when such information is tied to finances and other personal information[, . . . and are thus] deterred from partaking in biometric identifier-facilitated transactions.

*Id.* 14/5(b)-(e).

## ARGUMENT

Plaintiff alleges various tangible and intangible harms that are each sufficiently concrete to constitute an injury in fact. Likewise, by virtue of the tangible and intangible harms he has suffered, Plaintiff has standing under the Illinois constitution[2] and statutory standing under BIPA.

### I. Plaintiff Has Article III Standing.

Crème's contention that Plaintiff lacks Article III standing is without merit. A long line of Supreme Court precedent demonstrates that Plaintiff has suffered multiple concrete harms, both tangible and intangible, in the form of misappropriated property, invasions of privacy, informational injury, and a risk of real harm -- each of which is sufficient to confer Article III standing.

#### A. *Spokeo* did not change the requirements for Article III standing.

To establish Article III standing, a plaintiff must show (1) that he has "suffered an injury in fact," (2) that the injury is "fairly traceable to the challenged conduct of the defendant," and (3) that the injury "is likely to be redressed by a favorable judicial decision." *Spokeo,* 136 S. Ct. at 1547.

The first requirement, injury in fact, has two components: the injury must be both (1) particularized and (2) concrete. Crème does not contest that the injuries suffered by Plaintiff are

---

[2] For the same reasons Plaintiff has alleged a concrete harm constituting an injury in fact, as discussed below, Plaintiff has more than satisfied the "distinct and palpable" requirement of the Illinois constitution, to the extent that requirement is even implicated in federal court.

sufficiently "particularized." Nor does Crème contend that Plaintiff fails to satisfy the other tests required for standing. Instead, Crème argues that Plaintiff has not suffered "concrete" injury resulting from Crème's undisputed BIPA violations. The argument is without merit.

The Court in *Spokeo* distilled several "general principles" from its prior cases, without going beyond those cases. *Id.* at 1550. First, it acknowledged that, although tangible injuries (like physical or economic harm) are "perhaps easier to recognize" as concrete injuries, "intangible injuries can nevertheless be concrete," as can injuries based on a "risk of harm." *Id.* at 1549. Second, "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* So if the "alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts" – or, put in fewer words, if "the common law permitted suit" in analogous circumstances – the plaintiff will have suffered a concrete injury that can be redressed by a federal court. *Id.* at 1549-50; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).

But a plaintiff need not dig up common-law analogues to establish a concrete injury, because the legislature has the power (and is in fact "well positioned") "to identify intangible harms that meet minimum Article III requirements," even those that "were previously inadequate in law." *Spokeo,* 136 S. Ct. at 1549. Accordingly, the third principle emphasized in *Spokeo* is that the legislature can elevate even "bare" procedural rights to a concrete injury if they protect against identified harm. Of course, "a bare procedural violation, divorced from any concrete harm" identified by the legislature, will not give rise to an Article III injury. *Id.* But a "person who has been accorded a procedural right to protect his concrete interests" has standing to assert that right, even "without meeting all the normal standards for redressability and immediacy." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992).[3]

---

[3] Critically, none of these principles are new. *See, e.g.*, Amy Howe, *Opinion analysis: Case on standing and concrete harm returns to the Ninth Circuit, at least for now*, SCOTUSblog (May 16, 2016), http://bit.ly/1TB3vd1 (describing *Spokeo* as a "narrow" decision). And the Court in *Spokeo* did not even apply these principles to the facts before it, choosing instead to remand the case to the Ninth Circuit, whose previous analysis was

Thus, *Spokeo* has done very little to change (or even clarify) the law; it simply summarizes the doctrine and provides examples of injuries that might (or might not) constitute concrete harm.

### B. Plaintiff Has Suffered Concrete Harms, Both Tangible and Intangible.

Crème does not dispute that it "collect[ed], capture[ed], purchase[d], receive[d] through trade, or otherwise obtain[ed]," 740 Ill. Comp. Stat. 14/15(b), as well as "possess[es]," 740 Ill. Comp. Stat. 14/15(a), Plaintiff's fingerprints without proper consent in violation of BIPA. Rather, Crème incorrectly claims that "Plaintiff does not allege any specific (or even general) harm" by its illegal misappropriation and storage of fingerprints, and that the resulting risk of identity theft and stolen children is "nonsense".[4] Crème's failure to comply with BIPA resulted in the misappropriation of Plaintiff's personal property, which is clearly a tangible, concrete harm. Moreover, Crème's failure to comply with BIPA also violated Plaintiff's right to receive disclosures regarding the collection and storage of his biometrics; his rights to privacy and personal security in his own identity; and his right to be free from a heightened risk of future harm – all of which are substantive, historically-recognized rights that the Illinois legislature deemed worthy of protection.

#### 1. Misappropriation of Property

Crème's misappropriation of Plaintiff's unique biometric identifiers, specifically his fingerprints, is a tangible harm that confers Article III standing.

Fingerprints are the biologically unique personal property of the individuals to whom they belong. *See Thelma Nicholson & Joseph Nicholson v. M & S Detective Agency, Inc. & Commonwealth of Pennsylvania*, No. NO. 3224., 1984 WL 320921 (Pa. Com. Pl. Nov. 8, 1984), *rev'd on other grounds Nicholson v. M & S Detective Agency, Inc.*, 94 Pa. Cmwlth. 521, 503 A.2d 1106 (1986). Indeed, the Illinois legislature

---

"incomplete" because it had "overlooked" concreteness. The Court, in other words, offered no assessment of the Ninth Circuit's analysis below, aside from its determination that the Ninth Circuit had failed to analyze concreteness as a separate step in the injury-in-fact inquiry.

[4] Though certain allegations of the Complaint are made on "information and belief," such allegations are sufficient at this stage. *See Lucas v. Ferrara Candy Co.*, No. 13 C 1525, 2014 WL 3611130, at *5 (N.D. Ill. July 22, 2014); *Follman v. Hosp. Plus of Carpentersville, Inc.*, 532 F. Supp. 2d 960, 963 n.1 (N.D. Ill. 2007).

recognized that fingerprints could be "sold", "purchased" and "received through trade," *inter alia* -- just like any other valuable property -- and thus enacted BIPA to outlaw such activities absent express written consent. 740 Ill. Comp. Stat. 14/15(b).

Having suffered a tangible harm stemming from Crème's misappropriation of his fingerprints, Plaintiff clearly has Article III standing to pursue his claims in this Court. *See Spokeo*, 136 S. Ct. at 1549; *see also id.* at 1551 (explaining that "[m]any traditional remedies for private-rights causes of action—such as for trespass, infringement of intellectual property, and unjust enrichment—are not contingent on a plaintiff's allegation of damages beyond the violation of his private legal right") (Thomas, J., concurring). Moreover, Plaintiff also suffered numerous intangible injuries that are by themselves sufficiently concrete to confer Article III standing, as discussed below.

### 2. Invasion of Privacy

*Spokeo* instructs courts to consider whether the intangible injury at issue "has a close relationship" to an injury recognized at common law. *Spokeo*, 136 S. Ct. at 1549 (citation omitted). In enacting BIPA, the Illinois legislature recognized, and chose to codify in the biometrics context, the concrete harm stemming from private industry's presumptuous arrogation of the fundamental right to privacy -- a right that is deeply rooted in history and the common law.

Invasion of privacy is a quintessential "harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," and thus is a legally cognizable injury for standing purposes. *See Spokeo*, 136 S. Ct. at 1549. Accessing private information, especially such sensitive information as biologically unique identifiers, without a legal basis to do so is a classic example of a modern-day analogue to well-recognized common law torts. *See Intrusion Upon Seclusion, Restatement (Second) of Torts* § 652B (1977) ("One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy..."); *Snakenberg v. Hartford Cas. Ins. Co.*, 383 S.E.2d 2, 5 (S.C. Ct. App. 1989) ("The law recognizes that each person has an interest in keeping certain facets of personal life from

exposure to others. This interest in 'privacy' is a distinct aspect of human dignity and moral autonomy.").[5] Thus, American courts have long recognized a general right to privacy "without being subjected to unwarranted and undesired publicity." *Gill v. Curtis Pub. Co.*, 239 P.2d 630, 632 (Cal. 1952) (en banc) (collecting cases); *see also* Restatement (Second) of Torts § 652A cmt. a (1977) (noting that "the existence of a right of privacy is now recognized in the great majority of the American jurisdictions that have considered the question"). Courts at the turn of the twentieth century identified the right of privacy as "derived from natural law," tracing the concept back to Roman and early English traditions. *Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 70 (Ga. 1905).[6]

Building on this tradition, the state of Illinois has not only historically recognized the harm associated with invasions of privacy generally, *see Leopold v. Levin*, 45 Ill. 2d 434, 440-41 (1970) ("Privacy is one of the sensitive and necessary human values and undeniably there are circumstances under which it should enjoy the protection of law."); *Cantrell v. Am. Broad. Companies, Inc.*, 529 F. Supp. 746, 756 (N.D. Ill. 1981), it has already protected the right to keep fingerprints private.  For instance, the Illinois legislature has exempted fingerprints from the court subpoena power, has declared unauthorized disclosure of fingerprints to be a Class "A" misdemeanor, and has regulated fingerprint machine vendors, *see* 305 Ill. Comp. Stat. Ann. 5/11-6.2; 225 ILCS 447/10–5(a).

BIPA thus affords Plaintiff and the Class substantive privacy and personal security rights that are explicitly intended to protect against the same types of injuries that were traditionally recognized at common law and are already recognized in Illinois by statute.  Accordingly, there can be no doubt that the collection of an individual's fingerprints without prior consent amounts to a "concrete" injury that bears, at a minimum, a "close relationship" to the common law's steadfast protection of one's

---

[5]   As Justice Brandeis explained in his seminal 1890 article on the right to privacy, "what is ordinarily termed the common-law right to intellectual and artistic property are . . . but instances and applications of a general right to privacy." Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 198 (1890).

[6]   "The fact that damages resulting from an invasion of the right of privacy cannot be measured by a pecuniary standard is not a bar to recovery." *Fairfield v. Am. Photocopy Equip. Co.*, 291 P.2d 194, 198 (Cal. Ct. App. 1955) (listing cases).

fundamental right of privacy. *See Spokeo*, 136 S. Ct. at 1551 (Thomas, J., concurring).

The "judgment of Congress" (in this case, the judgment of the Illinois legislature) -- which is both "instructive and important," *Spokeo*, 136 S. Ct. at 1549 -- also confirms that Plaintiff's claims satisfy Article III. In the enacting provisions of BIPA, the Illinois legislature expressly found that: (1) "Biometrics are unlike other unique identifiers...[and] are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions" (*id.* at 14/5(c)); and (2) "[t]he public welfare, security and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information" (*id.* at 14/5(g)). In connection with these findings, the Illinois legislature implemented a series of safeguards intended to protect the privacy of personal biometric data. Among other protections, BIPA requires written policies on biometric data retention and informed consent before obtaining, disclosing or selling personal biometric data. *Id.* at 14/15(a)-(d). In fact, recognizing the judgment of the Illinois legislature in this regard, the U.S. District Court for Northern California recently concluded, in another BIPA class action against Facebook, that "<u>the plain language of BIPA indisputably evinces a fundamental privacy policy of Illinois.</u>" *In re Facebook Biometric Info. Privacy Litig..,* No. 15-CV-03747-JD, 2016 WL 2593853, at *10 (N.D. Cal. May 5, 2016) (emphasis added)).

Crème's contention that the Complaint merely alleges violation of a "bare" procedural right that is insufficient to confer standing is wrong. First, the right to privacy is a substantive right, as discussed above. Second, even if the privacy right at issue in this case were procedural, *Spokeo* reaffirmed that a procedural violation of a statute may nevertheless constitute a concrete harm if the plaintiff shows a risk of harm that the statute was meant to protect against. For example, when "a consumer reporting agency fails to provide the [FCRA's] required notice to a user of the agency's consumer information" (a notice that is not a precondition to anything), the plaintiff's path to a concrete injury will be harder, because that information "may be entirely accurate" and FCRA is designed to curb the inaccurate

reporting of information. *Spokeo*, 136 S. Ct. at 1550. The Court suggested that the same is true if the reported information contains only "an incorrect zip code." *Id.* In contrast to those harmless procedural violations, Plaintiff's BIPA claims arise from the precise injury that the statute seeks to prevent. The invasion of an individual's right to privacy (in this case by misappropriating sensitive, personal biological information) is the precise intangible harm that has long been recognized in the common law and was "elevat[ed] to the status of legally cognizable injuries," *id.* at 1549 (quotation omitted), through the enactments of BIPA. *See In re Facebook Biometric Info. Privacy Litig.,* 2016 WL 2593853, at *10.[7]

Plaintiff's injury is thus concrete. The privacy intrusion inherent in the unauthorized collection of biometrics is not some violation of a mere procedural requirement intended to prevent some downstream or consequential injury, but rather is the injury itself. An allegation of unauthorized collection -- and nothing more -- therefore confers Article III standing under *Spokeo*. *See, e.g., Boelter v. Hearst Commc'ns, Inc.*, --- F. Supp. 3d ---, 2016 WL 3369541, at *3 (S.D.N.Y. 2016).

### 3. Informational Injury

Plaintiff also suffered an informational injury because Crème failed to provide any of the requisite written disclosures. Rooted in history and the common law, the fundamental right to information was recognized by the Illinois legislature as worthy of protection in the biometrics context when it was codified in BIPA.

Crème's disclosure violations, *see* 740 Ill. Comp. Stat. 14/15, correspond with longstanding claims at common law. For instance, the common law has regularly recognized heightened disclosure requirements in the context of transactions between parties in a confidential or fiduciary relationship;

---

[7] Moreover, "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Spokeo*, 136 S. Ct. at 1549 (quoting *Lujan*, 504 U.S., at 578). Here, however, the Illinois legislature recognized that private entities' collection and storage of biometrics without adequate disclosure and authorization harmed individuals' privacy interests -- a concrete injury that was considered *adequate* at common law and in Illinois long before the Illinois legislature enacted BIPA. There is therefore no doubt that, on the basis of his privacy-related injuries alone, Plaintiff has standing to bring his claims for violation of BIPA.

transactions concerning the acquisition of insurance, surety, or a release from liability; transactions in which the parties have unequal access to information; and transactions concerning the transfer of real property, among others. *See* Kathryn Zeiler & Kimberly D. Krawiec, *Common-law Disclosure Duties and the Sin of Omission: Testing Meta-Theories* 91 Va. L. Rev. 1795–1882 (2005).

In fact, in discussing several forms of intangible injuries that satisfy concreteness, the Supreme Court in *Spokeo* cited to *Public Citizen v. U.S. Department of Justice*, which held that the plaintiff had standing to challenge the Justice Department's failure to provide access to information, the disclosure of which was required by the Federal Advisory Committee Act, because the inability to obtain such information "constitutes a sufficiently distinct injury to provide standing to sue." 491 U.S. 440, 449 (1989). It also cited *Federal Election Commission v. Akins* for a similar point, "confirming that a group of voters' 'inability to obtain information' that Congress had decided to make public is a sufficient injury in fact to satisfy Article III." *Spokeo*, 136 S. Ct. at 1549 (citing *Akins*, 524 U.S. 11, 20–25 (1998)). These cases illustrate that an informational injury (*i.e.*, being denied access to information to which an individual is entitled by statute) is a concrete injury under Article III.

Thus, under Supreme Court precedent expressly reaffirmed in *Spokeo*, *see Spokeo*, 136 S. Ct. at 1549-50, Plaintiff "suffer[ed] an 'injury in fact,'" because he was unable "to obtain information which must be publicly disclosed pursuant to [BIPA]," *Akins*, 524 U.S. at 21; *see also Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 956 (7th Cir. 2005) (citing *Akins*, and holding that a failure to receive information that a statute specifically requires be produced constitutes an injury in fact). That is, the deprivation of information that Plaintiff suffered "constitutes a sufficiently distinct injury to provide standing to sue." *Public Citizen*, 491 U.S. at 449. And just like Crème's invasion of Plaintiff's privacy discussed above, Crème's violation of Plaintiff's right to receive certain disclosures pursuant to BIPA was not procedural but substantive in nature -- thus placing Plaintiff's BIPA claim even further beyond a "bare procedural violation, divorced from any concrete harm," *Spokeo*, 136 S. Ct. at 1549, is insufficient to confer standing. *See, e.g., Church v. Accretive Health, Inc.*, No. 15-15708, 2016 WL 3611543, at *3 n.3 (11th Cir.

July 6, 2016) ("In *Spokeo*, the Court stated that a Plaintiff 'cannot satisfy the demands of Article III by alleging a bare procedural violation.' This statement is inapplicable to the allegations at hand because Church has not alleged a procedural violation. Rather, Congress provided Church with a substantive right to receive certain disclosures and Church has alleged that Accretive Health violated that substantive right.") (citation omitted)).

With BIPA, Illinois sought to prevent exposing individuals to the "heightened risk for identity theft" inherent in biometrics collection, which would "likely" cause people "to withdraw from biometric-facilitated transactions." To reduce these inherent risks, and to allow people to make informed decisions about their biometrics, the Illinois legislature enacted BIPA to require private entities to first provide detailed disclosures to individuals of the collection and storage (and the specific purpose and duration of such collection and storage) of their fingerprints and other biometrics, 740 Ill. Comp. Stat. 14/15 (b). Because the legislature "is well positioned to identify intangible harms that meet minimum Article III requirements," its "judgment" is both "instructive and important." *Spokeo*, 136 S. Ct. at 1549. This Court should respect the Illinois' considered judgment and conclude that Plaintiff has standing to assert claims for violation of BIPA.

Moreover, that Plaintiff was "aware of the purpose" (Mot. at 10) of Crème's collection of his fingerprints is irrelevant. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court held that a housing-discrimination "tester" had standing based on a violation of "[his] statutorily created right to truthful housing information." *Id.* at 374. Although the tester had no "intention of buying or renting a home" and "fully expect[ed] that he would receive false information," *id.* at 373–374, the Court held that "[a] tester who has been the object of a misrepresentation made unlawful under [the statute] has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing." *Id.* So too here. Whether Plaintiff was "aware of the purpose" of Crème's collection and storage of his fingerprints is irrelevant for standing purposes so long as he suffered the type of injury BIPA "was intended to guard against," *Havens*, 455 U.S. at 373; *see also Spokeo*, 136 S. Ct. at 1549 (noting

- 11 -

that "a plaintiff in [certain] case[s] need not allege any additional harm beyond the one Congress has identified" in the statute). And there is no question that he did here. To ensure that individuals are adequately informed about their rights concerning their biometric identifiers and biometric information, especially fingerprints, BIPA requires that certain key written disclosures regarding purpose and duration be provided prior to the collection process. By failing to comply with these requirements, Crème caused the exact type of harm the Illinois legislature "has identified" in the statute. *See id.* This informational harm is neither hypothetical nor uncertain, *e.g., Church*, 2016 WL 3611543, at *3, and thus clearly satisfies the requirements of Article III, *e.g., id.*; *In re Nickelodeon Consumer Privacy Litig.,* No. 15-1441, 2016 WL 3513782, at *7 (3d Cir. June 27, 2016) ("Intangible harms that may give rise to standing [] include harms … such as unlawful denial of access to information subject to disclosure.").[8]

A contrary result would have far-reaching implications, not only for BIPA, but for numerous other statutes that seek to protect consumers by requiring disclosures and allow the recovery of statutory damages for failure to comply.[9] If individuals are no longer permitted to seek redress when defendants fail to comply with statutorily mandated disclosure requirements, the failure to comply with those requirements, and the attendant abuses, will not be far behind.

### 4. Risk of Real Harm

A "risk of real harm" resulting from a statutory violation may also "satisfy the requirement of concreteness." *Spokeo*, 136 S. Ct. at 1549. Plaintiff alleges a risk of real harm in this case.

In evaluating the risk sufficient to support standing, courts engage in an analysis that "is qualitative, not quantitative, in nature." *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003) (internal

---

[8] *See also, e.g., Pollard v. Law Office of Mandy L. Spaulding*, 766 F.3d 98, 102-03 (1st Cir. 2014); *Charvat v. Mutual First Fed. Credit Union*, 725 F.3d 819, 823 (8th Cir. 2013); *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 386-87 (5th Cir. 2003); *DeMando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000).

[9] The Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, (TILA) and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*, (RESPA) are only two consumer-protection statutes that would be gutted if *Spokeo* were misinterpreted as eliminating standing based on informational injury. *See, e.g.*, 15 U.S.C. § 1638 (TILA); 15 U.S.C. § 1640(a)(2)(B) (allowing for statutory damages for failure to comply with TILA); 12 U.S.C. § 2605(c) (requiring disclosures under RESPA in certain circumstances); 12 U.S.C. § 2605(f)(1)(B) (RESPA).

quotation marks and citation omitted). Further, "[b]ecause the evaluation of risk is qualitative, the probability of harm which a plaintiff must demonstrate in order to allege a cognizable injury[]in[]fact logically varies with the severity of the probable harm." *Id.* (citation omitted).

The Complaint alleges that an extraordinarily severe and inherent harm could result if Crème's illegal biometrics database were to fall into the wrong hands: identity theft and theft of children. *See id.* ¶ 7. Indeed, fingerprint misappropriation allows for almost **instantaneous** identify theft. Fingerprints are the modern standard by which the police and FBI verify a person's identity. They are used by tens of millions of iPhone users daily to authorize bank transactions and retail purchases. And they are the quintessential proof of criminal guilt. *E.g., United States v. Tavarez*, 626 F.3d 902, 906 (7th Cir. 2010). Crème, unfortunately, cannot guarantee the security of its biometric data any more than Target, Sony, or the Office of Personnel Management were able to ensure the security of their electronically-stored data.[10] The parents who enrolled their children in Crème's school programs deserved to know these risks <u>before</u> they lost control of their unique biometrics. Such a risk of severe harm, and the lack of awareness of such a harm, are precisely the types of injuries the Illinois legislature sought to redress in enacting BIPA. *See* 740 ILCS 14/5(c) ("Biometrics . . . are biologically unique to the individual; therefore, **once compromised, the individual has no recourse**<u>, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions."</u> ) (emphasis added).

Requiring a person to wait until he or she is actually injured by the unauthorized collection of biometrics – for instance, until *after* a child is picked up from school by a stranger – would defeat both the spirit and purpose of BIPA. *See Spokeo*, 136 S. Ct. at 1550. The Complaint alleges a "risk of real harm" from Crème's collection and indefinite storage of Plaintiff's fingerprints that is sufficient to

---

[10]   There is a real risk that Plaintiff's biometric identity could be compromised at any time, because the technology for fingerprint tampering and replication is readily available on the Internet. *See* Simon A. Cole, <u>Fingerprinting: The First Junk Science?</u>, 28 Okla. City U. L. Rev. 73, 77-78 (2003) (citing ABC World News Tonight: *Police Faking Fingerprints to Solve Cases* (ABC television broadcast, Feb. 15, 1994)); *see also* http://www.ibtimes.com/hacker-demonstrates-how-fake-fingerprint-sensors-using-regular-photographs-769408 ("'Biometrics that rely on static information like face recognition or fingerprints … are not a great form of security because they can be faked[.]'").

confer Article III standing.[11] *See Boelter*, 2016 WL 3369541, at *3 (alleged "risk of being victimized by 'scammers'" resulting from violation of state statute conferred Article III standing).[12]

## II. Plaintiff Has Statutory Standing Under BIPA.

Crème also moves to dismiss the Complaint pursuant to Rule 12(b)(6). Crème contends that Plaintiff has failed to adequately allege that he is a "person aggrieved" within the meaning of BIPA, which Crème asserts is a "limiting proviso" of BIPA that is more stringent than Article III. The argument is without merit.

Under Supreme Court precedent, "persons aggrieved" is a term of common usage that refers to a plaintiff who falls within the "zone of interests" sought to be protected by the statute. *See, e.g., Thompson v. N. Am. Stainless*, 562 U.S. 170, 178 (2011). As such, the term "aggrieved," when used in a statute, enables suit "by any plaintiff with an interest 'arguably [sought] to be protected by the statute,' while excluding plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions." *Id.* (citation omitted). Accordingly, Plaintiff satisfies the "persons aggrieved" standard for same reasons he satisfies the injury in fact requirement of Article III, as discussed above. *See, e.g., Anjelino v. New York Times Co.,* 200 F.3d 73, 90 (3d Cir. 1999) ("In *Hackett*, we found Article III's case or controversy requirements to have been satisfied by the plaintiff's allegations that demonstrated that he was a 'person aggrieved' as required by the statute[.]")).

Illinois law confirms that Plaintiff is "aggrieved" within the meaning of BIPA. In *Mandziara v. Canulli*, 299 Ill. App. 3d 593, 701 N.E. 2d 127 (1998), the plaintiff brought an action against the defendant, her former husband, for subpoenaing her mental health records without a court order in violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act ("MHA"),

---

[11] This real "risk of real harm" can be redressed because this Court can compel Crème to permanently destroy Plaintiff's (and the Class's) biometric identifiers and information from its illegal database.

[12] *See also, e.g., Johnson v. Allsteel, Inc.*, 259 F.3d 885, 888 (7th Cir. 2001); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1231, 1234–35 (D.C. Cir. 1996); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006); *Engel v. Scully & Scully, Inc.*, 279 F.R.D. 117, 123–24 (S.D.N.Y. 2011); *Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, 580 F. Supp. 2d 273, 279-80 (S.D.N.Y. 2008) (relying on *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007)).

- 14 -

740 ILCS 110/1-17. The MHA provides that "[a]ny person aggrieved by a violation of this Act may sue for damages, an injunction, or other appropriate relief." 740 ILCS 110/15. In rejecting the defendant's argument that the plaintiff failed to state a claim because the defendant did not look at plaintiff's records and thus did not actually harm the plaintiff, the court concluded that the plaintiff was a "person aggrieved" under FHA by virtue of the defendant's violation of the disclosure restrictions of 740 ILCS 110/10(d). *Id.* at 600 ("a person aggrieved by a violation of the Act" is entitled to "a remedy of damages against persons who violate the act," without regard for the "nature and extent of those damages"). Here, the phrase "person aggrieved" under BIPA has the same meaning. Plaintiff is a "person aggrieved" and has statutory standing based on Crème's violations of the protections of BIPA.

*Padilla*, a case on which Crème relies, does not instruct differently because that case only dealt with information that was lawfully obtained in the first instance, unlike here where Crème collected the private information initially in violation of BIPA. *See Padilla v. Dish Network L.L.C.,* No. 12-CV-7350, 2013 WL 3791140, at *4 (N.D. Ill. July 19, 2013) (addressing whether plaintiff stated "a claim for damages based on the retention of personal information **'lawfully obtained and not disclosed'**[.]") (emphasis added)). In this case, unlike *Padilla*, Plaintiff was aggrieved by the unauthorized collection of his biometrics in the first instance -- a misappropriation of his personal property, an invasion of his substantive right to privacy, and a violation of his substantive right to information, as discussed above.[13]

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied.

---

[13] Crème also cites three inapposite cases -- with misleading parentheticals -- in support of its incorrect contention that, because the term "aggrieved" is not "specifically defined" in BIPA, Plaintiff is required to demonstrate that he suffered an "actual" injury "other than simply an alleged violation of the statue itself." (Mot. at 13.) Both *Williams v. Merle Pharmacy, Inc.*, No. 15-CV-1262, 2015 WL 6143897, at *3 (C.D. Ill. Oct. 19, 2015), and *Finstad v. Washburn Univ. of Topeka*, 252 Kan. 465, 845 P.2d 685 (1993), merely addressed whether a statute conferred a private right of action – not whether the Plaintiffs had statutory standing as "aggrieved persons" under a statute like BIPA that expressly creates a private right of action. In *Diedrich v. Ocwen Loan Servicing, LLC*, No. 13-CV-693, 2015 WL 1885630 (E.D. Wis. Apr. 24, 2015), the court held that, "[w]ithout evidence of damages, the Diedrichs' claims under Wis. Stat. § 224.77(1) fail and summary judgment is granted in favor of Ocwen." *Id.* at *10. *Deidrich* is inapposite because it fails to address any of the concrete harms that Plaintiff suffered, and was thus "aggrieved" by, as discussed above. Rather, the court focused entirely on economic damages, which are plainly not at issue in this case.

| | |
|---|---|
| Dated: July 12, 2016 | Respectfully submitted,<br><br>/s/ David P. Milian<br>Jennifer W. Sprengel<br>Daniel O. Herrera<br>**CAFFERTY CLOBES**<br>**MERIWETHER & SPRENGEL LLP**<br>150 S. Wacker Dr., Suite 3000<br>Chicago, Illinois 60606<br>Phone: (312) 782-4880<br>jsprengel@caffertyclobes.com<br>dherrera@caffertyclobes.com<br><br>David P. Milian (*pro hac vice*)<br>Frank S. Hedin (*pro hac vice*)<br>**CAREY RODRIGUEZ**<br>**MILIAN GONYA, LLP**<br>1395 Brickell Avenue, Suite 700<br>Miami, Florida 33131<br>Telephone: (305) 372-7474<br>dmilian@careyrodriguez.com<br>fhedin@careyrodriguez.com<br><br>**Counsel for Plaintiff and the Putative Class** |

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ David P. Milian<br>
David P. Milian